UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YROK

| | |
|---|---|
| DR. KATHERINE M. WHIPPLE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| REED EYE ASSOCIATES; | ) |
| WESTFALL SURGERY CENTER, LLP; DR. RONALD | ) |
| REED;  DR. ALAN BLOOM; DR. KURT WEISSEND; | ) |
| GARY SCOTT, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**COMPLAINT**

**JURY TRIAL DEMAND**

Civil Action No. _____

Plaintiff Katherine M. Whipple, by and through her undersigned attorneys, Blitman & King LLP,

as and for her complaint, respectfully alleges as follow:

## NATURE OF THE CASE

1.      This is a civil action for sex discrimination and retaliation in violation of Title VII

of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et. seq., Article 15 of the New York

Executive Law, N.Y. Exec. Law §§ 296-301, also known as the New York State Human Rights Law

("NYSHRL"), and for defamation and tortious interference with business relations in violation of

the common law of the State of New York.

## JURISDICTION AND VENUE

2.      The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 2000e-5(f) and 28

U.S.C. § 1331.  This Court has supplemental jurisdiction of claims arising under the laws of the

State of New York pursuant to 28 U.S.C. § 1367.

3.      Venue in this action lies in the Western District of New York under 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1391.

**PARTIES**

4.      Plaintiff Dr. Katherine M. Whipple is a resident of the State of New York.  Plaintiff is a board certified ophthalmologist and oculofacial plastic surgeon.

5.      Plaintiff was until January 6, 2015 an "employee" of Defendant Reed Eye Associates ("Reed Eye") within the meaning of Title VII and the NYSHRL.

6.      Plaintiff was until January 6, 2015 an "employee" of Defendant Westfall Surgery Center ("Westfall") within the meaning of Title VII and the NYSHRL.

7.      According to its website, Reed Eye is a "full-service eye care group", offering "primary eye care", "glaucoma care", and "cataract surgery".

8.      Reed Eye is owned by Defendants Dr. Ronald Reed and Dr. Alan Bloom.

9.      Reed Eye maintains its principal place of business at 500 Kreag Road, Pittsford, New York 14534.

10.     Reed Eye has additional offices in: Greece, New York; Irondequoit, New York; Sodus, New York; Newark, New York; and Batavia, New York.

11.     Reed Eye is an "employer" within the meaning of Title VII and the NYSHRL. During all relevant periods, Reed Eye was engaged in an industry affecting commerce and had fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar years during which Plaintiff was an employee.

12.     Westfall is a limited liability partnership organized under the laws of the State of New York.

13.     Westfall's principal place of business is located at 1065 Senator Keating Boulevard, Rochester, New York 14618.

14.     Westfall is a licensed, multi-specialty, free-standing ambulatory surgery center offering various out-patient surgical procedures and medical services.

15.     Westfall is an "employer" within the meaning of Title VII and the NYSHRL. During all relevant periods, Westfall was engaged in an industry affecting commerce and had fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar years during which Plaintiff was an employee.

16.     Defendants Reed Eye and Westfall operate jointly as an integrated enterprise for purposes of liability under Title VII and the NYSHRL.

17.     Reed Eye and Westfall are operationally related.

18.     Reed Eye and Westfall share managers and personnel.

19.     Reed Eye and Westfall share insurance programs.

20.     Reed Eye and Westfall share office space and equipment.

21.     Reed Eye and Westfall share licensing and accreditation procedures.

22.     Reed Eye and Westfall are commonly supervised and managed by overlapping officers and directors.

23.     Reed Eye and Westfall share centralized control over labor relations and employment matters.

24.     Reed Eye and Westfall are commonly owned.

25.     Defendant Dr. Ronald Reed is an ophthalmologist.

26.     Dr. Reed owns one-half of Reed Eye.

27.     Dr. Reed is the Director of Westfall.

28.     Dr. Reed is one of several owners of Westfall.

29.     Defendant Dr. Alan Bloom is an ophthalmologist.

30.     Dr. Bloom owns one-half of Reed Eye.

31.     Dr. Bloom is one of several owners of Westfall.

32.     Defendant Dr. Kurt Weissend was until in or around December 2014 the Medical Director and Chief of Anesthesiology at Westfall.

33.     As Medical Director, Dr. Weissend was responsible for scheduling and managing the surgical rotation for all practitioners performing surgery at Westfall, including Plaintiff.

34.     Defendant Gary Scott is the Administrative Director at Westfall.

## ADMINISTRATIVE EXHAUSTION

35.     On March 27, 2015, Plaintiff filed a Charge of Discrimination against Reed Eye, Westfall, Dr. Reed, Dr. Bloom, Dr. Weissend and Mr. Scott (collectively "Defendants") with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging sex discrimination and retaliation in violation of Title VII based on substantially the same facts alleged herein.

36.     On December 2, 2015, Plaintiff received a Notice of Right to Sue from the EEOC.

## FACTUAL ALLEGATIONS

37.     On September 1, 2013, Plaintiff became employed by Defendant Reed Eye as an ophthalmologist and oculofacial plastic surgeon pursuant to a one (1) year employment agreement.

38.     Throughout Plaintiff's employment with Reed Eye, she maintained a personal office at Reed Eye's Pittsford office, located at 500 Kreag Road, Pittsford, New York 14534.

4

39.   On September 17, 2013, Plaintiff was appointed to the medical staff at Westfall.

40.   Plaintiff maintained clinical privileges at Westfall.

41.   Between September 2013 and December 2014, Plaintiff performed surgeries on her Reed Eye patients at Westfall.

42.   On May 12, 2014, Dr. Weissend asked Plaintiff to attend dinner with him to discuss certain "Westfall issues".

43.   At the conclusion of this dinner, Dr. Weissend attempted to kiss Plaintiff.

44.   Plaintiff rejected Dr. Weissend's attempt to kiss her.

45.   Plaintiff told Dr. Weissend not to do that again, referring to Dr. Weissend's attempt to kiss her.

46.   On May 13, 2014, Dr. Weissend told Plaintiff that he had romantic feelings for her.

47.   On May 13, 2014, Dr. Weissend requested Plaintiff engage in a sexual relationship with him.

48.   Plaintiff rejected Dr. Weissend's request that she engage in a sexual relationship with him.

49.   Plaintiff told Dr. Weissend that she did not have romantic feelings for him.

50.   On May 15, 2014, Dr. Weissend told Plaintiff that he was "daydreaming" about her.

51.   Plaintiff texted Dr. Weissend on May 15, 2014 that "nothing happened and nothing can happen."

52.   On May 17, 2014, Dr. Weissend attempted to kiss Plaintiff.

53.     On May 17, 2014, Dr. Weissend requested that Plaintiff engage in sexual relationship with him.

54.     Plaintiff rejected Dr. Weissend's attempt to kiss her.

55.     Plaintiff rejected Dr. Weissend's request that she engage in a sexual relationship with him.

56.     Upon information and belief, around late May 2014, Dr. Weissend's wife, Anne Marie Weissend ("Mrs. Weissend"), became aware that Dr. Weissend bore romantic feelings for Plaintiff.

57.     Upon information and belief, around later May 2014, Mrs. Weissend became aware that Dr. Weissend desired to have a sexual relationship with Plaintiff.

58.     On May 21, 2014, Mrs. Weissend and Dr. Weissend's daughter, Ariana Weissend, waited in the parking lot of the Reed Eye office in Greece, New York, where Plaintiff was working that day.

59.     When Plaintiff emerged from the office at the end of the work day Ariana Weissend confronted Plaintiff in the parking lot about the alleged sexual relationship with her father, Dr. Weissend.

60.     Plaintiff told Ariana Weissend that at no time had there been a romantic relationship between Plaintiff and Dr. Weissend.

61.     Plaintiff told Ariana Weissend that she had not engaged in a sexual relationship with Dr. Weissend.

62.     Upon information and belief, Mrs. Weissend observed the confrontation between Ariana Weissend and Plaintiff from her car which was parked nearby.

63.     On May 21, 2014, Plaintiff sent a text message to Dr. Weissend stating that she was "approached inappropriately by one of your daughters on Reed Eye property today."

64.     On May 21, 2014, Plaintiff texted Dr. Weissend demanding that he never speak with her again regarding non-work related matters.

65.     On May 21, 2014, Plaintiff texted Dr. Weissend demanding that he "please leave her alone."

66.     Thereafter, between May 21, 2014 and June 23, 2014, Plaintiff received a series of text messages from Mrs. Weissend.

67.     The text messages sent from Mrs. Weissend to Plaintiff were harassing and threatening in nature.

68.     Dr. Weissend took no action to prevent Mrs. Weissend from sending these text messages to Dr. Whipple.

69.     On June 24, 2014, Mrs. Weissend confronted Plaintiff at the Back Nine Bar and Grill, a local restaurant in Pittsford, New York.

70.     When Plaintiff attempted to leave the restaurant, Mrs. Weissend grasped Plaintiff, physically restrained her from leaving the restaurant, and continued to verbally harass her.

71.     Plaintiff was eventually able to flee from the Back Nine Bar and Grille on June 24, 2014.

72.     On June 24, 2014, Plaintiff telephoned 911 and a police officer arrived on the scene at the Back Nine Bar and Grille.

73.     The police officer ordered Mrs. Weissend to avoid all contact with Plaintiff in the future.

74.     Dr. Weissend was present at the Back Nine Bar and Grill when Mrs. Weissend confronted Plaintiff.

75.     Dr. Weissend observed the confrontation between Mrs. Weissend and Plaintiff.

76.     Dr. Weissend took no action to prevent Mrs. Weissend from attacking Plaintiff.

77.     On July 1, 2014, Mrs. Weissend disobeyed police orders and resumed contacting Plaintiff.

78.     Mrs. Weissend was, on April 17, 2015, convicted of criminal harassment in the second degree.

79.     Mrs. Weissend was convicted of criminal harassment in the second degree because she contacted Plaintiff in violation of the no contact order instituted after Defendant confronted Plaintiff at the Back Nine Bar and Grille on June 24, 2014.

80.     On July 1, 2014, Plaintiff sent a text message to Heather Bartlett, the Clinical Director at Westfall, to complain about the harassment perpetrated against her by Dr. Weissend and Mrs. Weissend.

81.     Plaintiff texted Ms. Bartlett on July 1, 2014 that "I told [Dr. Weissend] that you know about the situation and that I'm scared of [Mrs. Weissend]."

82.     Plaintiff also texted Ms. Bartlett that "this has gotten out of control", referring to Dr. Weissend's harassment of her.

83.     In or around early July 2014, Dr. Weissend told Plaintiff that he wanted to make love to her.

84.     In or around early July 2014, Dr. Weissend told Plaintiff that he was still very attracted to her.

85.     Upon information and belief, around early August 2014, Mrs. Weissend visited the Westfall office in Brighton, New York, where she was prohibited from entering.

86.     Upon information and belief, Mrs. Weissend, while at Westfall around early August 2004, entered a patient secured area.

87.     Upon information and belief, Mrs. Weissend asked at least one (1) Westfall employee questions about Plaintiff.

88.     Upon information and belief, Mrs. Weissend asked the Westfall employee about Plaintiff's current whereabouts.

89.     Upon information and belief, Mrs. Weissend asked the Westfall employee about Plaintiff's upcoming surgical schedule.

90.     Upon information and belief, Mrs. Weissend asked the Westfall employee about Plaintiff's upcoming office location assignments.

91.     Upon information and belief, the Westfall employee who was questioned by Mrs. Weissend in or around early August 2014 subsequently contacted Ms. Bartlett to report the incident.

92.     On August 5, 2014, Plaintiff met with Administrative Director Gary Scott and Ms. Bartlett.

93.     During that August 5, 2014 meeting, Plaintiff complained to Mr. Scott and Ms. Bartlett about the harassment perpetrated against her by Dr. Weissend.

94.     During that August 5, 2014 meeting, Plaintiff complained to Mr. Scott and Ms. Bartlett about the harassment perpetrated against her by Mrs. Weissend.

95.     Plaintiff told Mr. Scott and Ms. Bartlett that Dr. Weissend claimed that he was romantically attracted to her.

96.     Plaintiff told Mr. Scott and Ms. Bartlett that Dr. Weissend had attempted to kiss her.

97.     Plaintiff told Mr. Scott and Ms. Bartlett that Dr. Weissend made unwanted sexual advances towards her.

98.     Plaintiff told Mr. Scott and Ms. Bartlett that Dr. Weissend had ignored Plaintiff's demand that he stop the behavior discussed in ¶¶ 95-97.

99.     Plaintiff also told Mr. Scott and Ms. Bartlett during the August 5, 2014 meeting that Dr. Weissend's harassment was impacting her employment and professional reputation at Reed Eye and Westfall.

100.    Plaintiff told Mr. Scott and Ms. Bartlett that Dr. Weissend mistreated her by refusing to work with her at Westfall.

101.    Plaintiff told Mr. Scott and Ms. Bartlett that Dr. Weissend was the only anesthesiologist at Westfall who refused to work in Plaintiff's surgical rotation.

102.    Plaintiff told Mr. Scott and Ms. Bartlett that, by refusing to work with Plaintiff, Dr. Weissend's behavior stigmatized her amongst the surgeons.

103.    Plaintiff told Mr. Scott and Ms. Bartlett that Dr. Weissend's behavior caused rumors to spread amongst the staff to the effect that Plaintiff was having an illicit sexual affair with Dr. Weissend.

104.    Mr. Scott refused to take any corrective action regarding Dr. Weissend after Plaintiff's complaints on August 5, 2014.

105.    Mr. Scott warned Plaintiff not to bring the issue of Dr. Weissend's harassment to Dr. Reed's attention.

106.    On October 24, 2014, Dr. Weissend placed a handwritten letter in Plaintiff's purse at Westfall.

107.    In this letter, Dr. Weissend wrote that he "was, and still am, attracted to you in many ways", referring to Plaintiff.

108.    Dr. Weissend wrote in this letter that he found Plaintiff "beautiful" and "sexy".

109.    Plaintiff texted Dr. Weissend on October 25, 2014 and told him that she received his "lengthy letter."

110.    Plaintiff texted Dr. Weissend on October 25, 2014 and told him to "[p]lease STOP", referring to the handwritten letter that Dr. Weissend gave to Plaintiff on October 24, 2014.

111.    Plaintiff texted Dr. Weissend on October 25, 2014 and told him that "I want nothing to do with [you] in a social manner.  Leave me alone."

112.    Plaintiff emailed Mr. Scott on October 26, 2014 to complain about the handwritten letter given to Plaintiff by Dr. Weissend on October 24, 2014.

113.    Plaintiff told Mr. Scott in her October 26, 2014 email that "I don't deserve to continue to be subjected to this".

114.    Plaintiff told Mr. Scott that "I have the right to operate in a place where I'm not continuously having to deal with harassment from either [Dr. Weissend] or his wife."

115.   Plaintiff told Mr. Scott that she had not been scheduled to work with Dr. Weissend since June 13, 2014, as Mrs. Weissend would not permit it.

116.   Plaintiff told Mr. Scott that Dr. Weissend's refusal to work with her since June 13, 2014 negatively impacted Plaintiff in a professional capacity.

117.   Plaintiff told Mr. Scott that "staff continuously ask why we are not working together which is embarrassing for me . . . [and] [t]he staff even started to ask non-related parties why we don't work together."

118.   Plaintiff told Mr. Scott that "[e]nough is enough" and "[h]ow much longer will this continue?!?  It needs to stop."

119.   Mr. Scott thereafter took no action to protect Plaintiff from Dr. Weissend's continued advances.

120.   In November 2014, Plaintiff complained to Dr. Ronald Reed about the harassment perpetrated by Dr. Weissend and his wife.

121.   Plaintiff also told Dr. Reed in November 2014 that Mr. Scott refused to do anything about the harassment perpetrated against her by Dr. Weissend and his wife.

122.   Dr. Reed told Plaintiff that "this is all drama", referring to Plaintiff's complaints of sexual harassment.

123.   Dr. Reed told Plaintiff that he "doesn't care about this shit", referring to Plaintiff's complaints of sexual harassment.

124.   On December 22, 2014, Dr. Alan Bloom issued a memorandum to "all [Westfall Surgery Center partners" to "voice his opinion regarding the recent issues between Dr. Kurt Weissend and Dr. Katherine Whipple."

125.    Dr. Bloom referred in his December 22, 2014 memorandum to Plaintiff's complaints of sexual harassment as being a "distraction" that "creates an unhealthy work environment."

126.    Dr. Bloom recommended that the partnership take no further action concerning Plaintiff's complaints.

127.    Dr. Bloom stated that "[Plaintiff] will not suffer any hardship."

128.    Dr. Bloom closed by "remind[ing]" the partners of Westfall that their "first and only responsibility as owners of Westfall is the care and well-being of the patients."

129.    Dr. Bloom stated that "[a]ll other considerations" beyond patient care, apparently including sexual harassment of an employee by a superior, "are moot."

130.    In or around December 2014, Dr. Weissend resigned as Medical Director of Westfall.

131.    Following his resignation as Medical Director of Westfall, Dr. Weissend retained clinical privileges at Westfall.

132.    Following his resignation as Medical Director of Westfall, Dr. Weissend continued to work in the surgical rotation at Westfall.

133.    Following his resignation as Medical Director of Westfall, Dr. Weissend continued to be the only member of the surgical rotation at Westfall who refused to work with Dr. Whipple.

134.    On December 30, 2014, Plaintiff emailed Dr. Reed that "this situation has only gotten worse since [Dr. Weissend resigned]" and that "[a]ll I have asked is to be treated equally. Nothing more."

135.    In or around December 2014, Plaintiff was engaged in partnership negotiations with Dr. Reed and Dr. Bloom.

136.    Dr. Reed and Dr. Bloom had, prior to December 2014, offered Plaintiff a one-third partnership stake in Reed Eye.

137.    In or around December 2014, Plaintiff was engaged in negotiations with Dr. Reed and Dr. Bloom concerning their offer of partnership.

138.    In or around December 2014, Plaintiff was also engaged in negotiations with Dr. Reed and Dr. Bloom to extend her employment contract.

139.    On January 5, 2015, Plaintiff received a telephone call from Mr. Scott advising her that Dr. Bloom wanted to meet and discuss Plaintiff's employment contract.

140.    On January 6, 2015, Plaintiff met with Dr. Bloom and Mr. Scott.

141.    On January 6, 2015, Plaintiff was dismissed from her employment with Reed Eye.

142.    On January 6, 2015, Plaintiff's clinical privileges at Westfall were terminated.

143.    Plaintiff's employment was terminated "without cause".

144.    Plaintiff was not told why her employment was terminated.

145.    Plaintiff was not told why her clinical privileges were terminated.

146.    Plaintiff was only told that she was an excellent surgeon and clinician.

147.    On January 6, 2015, Plaintiff was forced to remove all personal items from her office while locksmiths actively changed the locks and staff watched in disbelief.

148.    Following her termination, Plaintiff sought employment as an ophthalmologist and oculofacial plastic surgeon with medical practitioners in the greater Rochester area.

149.    Plaintiff had a verbal agreement to work with Dr. Theresa Farugia.

14

150.   Dr. Farugia is an optometrist practicing in Webster, New York.

151.   Upon information and belief, Dr. Bloom was aware of Plaintiff's agreement to work with Dr. Theresa Farugia.

152.   Upon information and belief, Dr. Bloom threatened retribution against Dr. Farugia if Dr. Farugia hired Plaintiff.

153.   Upon information and belief, Dr. Bloom also threatened retribution against Dr. Farugia's husband, Dr. Charles Ellermeyer - an optometrist employed by Reed Eye — if Dr. Farugia hired Plaintiff.

154.   Dr. Farugia withdrew her offer of employment to Plaintiff.

155.   Plaintiff also sought employment from Dr. Ralph Viola.

156.   Dr. Ralph Viola is an ophthalmologist practicing in Fairport, New York.

157.   Upon information and belief, when Dr. Reed learned that Plaintiff was seeking employment with Dr. Viola, Dr. Reed told Dr. Viola that Plaintiff "got really bitchy at the end."

158.   After Plaintiff was unable to gain employment with Dr. Farugia or Dr. Viola, Plaintiff established her own medical practice.

159.   Upon information and belief, Dr. Bloom has deliberately prevented patients from seeking medical care at Plaintiff's new practice.

160.   Upon information and belief, following Plaintiff's termination, Dr. Bloom falsely told at least one (1) patient that Plaintiff was moving back to San Diego, California, where she completed her residency, and would no longer be accepting patients in Rochester.

161.   Upon information and belief, following Plaintiff's termination, Dr. Bloom falsely told several patients that Plaintiff was refusing to see her former Reed Eye and Westfall patients.

162.   Upon information and belief, following Plaintiff's termination, Defendants refused to refer patients to Plaintiff.

163.   Upon information and belief, Defendants told at least one (1) patient who requested to be referred to Plaintiff that she could only be referred to Dr. Sean Morgan, a local ophthalmologist.

164.   When the patient described in ¶ 163 made an appointment with Plaintiff, Defendants refused to provide Plaintiff with the patient's medical records and test results.

165.   Upon information and belief, Defendants told at least one (1) patient that "we are not allowed to fax anything to [Plaintiff].  We can only send these to Dr. Morgan's office."

166.   Defendants engaged in the above-described conduct in an effort to intentionally discriminate and retaliate against Plaintiff.

167.   As a direct consequence of Defendants' conduct, Plaintiff has suffered economic damages and severe mental anguish and emotional harm.

**FIRST CAUSE OF ACTION**

**Discrimination on the Basis of Sex**
**Section 703 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2**

168.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

169.   This Court has jurisdiction over Plaintiff's First Cause of Action pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1331.

16

170.    Defendants terminated Plaintiff's employment and discriminated against Plaintiff with respect to other terms, conditions, and privileges of employment because of Plaintiff's sex and opposition to sexual harassment perpetrated against her.

171.    Defendants' conduct constitutes a violation of Section 703 of Title VII.

172.    As a direct and proximate cause of such conduct, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and has suffered and continues to suffer distress, humiliation, embarrassment, and damage to her personal and professional reputation.

## SECOND CAUSE OF ACTION

### Unlawful Retaliation
### Section 704 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3

173.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

174.    This Court has jurisdiction over Plaintiff's Second Cause of Action pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1331.

175.    Plaintiff engaged in protected activity under Title VII by opposing Defendants' unlawful discriminatory acts.

176.    Defendants were aware of Plaintiff's protected activity.

177.    Defendants retaliated against Plaintiff because she engaged in protected activity.

178.    Defendants conduct constitutes a violation of Section 704 of Title VII.

179.    As a direct and proximate result of such conduct, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and

has suffered and continues to suffer distress, humiliation, embarrassment, and damage to her personal and professional reputation.

### THIRD CAUSE OF ACTION

**Discrimination on the Basis of Sex**
**Section 296(1)(a) of the NYSHRL, N.Y. Executive Law § 296(1)(a)**

180.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

181.    This Court has supplemental jurisdiction over Plaintiff's Third Cause of Action pursuant to 28 U.S.C. § 1367.

182.    Defendants' conduct, as described above, constitutes a violation of Section 296(1)(a) of the NYSHRL.

183.    As a direct and proximate result of such conduct, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and has suffered and continues to suffer distress, humiliation, embarrassment, and damage to her personal and professional reputation.

### FOURTH CAUSE OF ACTION

**Unlawful Retaliation**
**Section 296(7) of the New York State Human Rights Law, N.Y. Executive Law § 296(7)**

184.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

185.    This Court has supplemental jurisdiction over Plaintiff's Fourth Cause of Action pursuant to 28 U.S.C. § 1367.

186.    Defendants' conduct, as described above, constitutes a violation of Section 296 (7) of the NYSHRL.

187.    As a direct and proximate result of such conduct, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and has suffered and continues to suffer distress, humiliation, embarrassment, and damage to her personal and professional reputation.

## FIFTH CAUSE OF ACTION

### Common Law Tortious Interference with Business Relations

188.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

189.    This Court has supplemental jurisdiction over Plaintiff's Fifth Cause of Action pursuant to 28 U.S.C. §1367.

190.    Plaintiff had a valid business expectancy with Dr. Therese Farugia who had agreed to employ Plaintiff following the termination of her employment.

191.    Defendants were aware of Plaintiff's valid business expectancy.

192.    Defendants maliciously and unlawfully interfered with Plaintiff's business relationship because Plaintiff engaged in protected activity under Title VII.

193.    Defendants' intentional interference caused injury to Plaintiff's business relationship, and Plaintiff is entitled to recover compensatory and punitive damages therefor.

## SIXTH CAUSE OF ACTION

## Common Law Defamation

194.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

195.    This Court has supplemental jurisdiction over Plaintiff's Fifth Cause of Action pursuant to 28 U.S.C. § 1367.

196.    Upon information and belief, Defendants have made statements to local medical practitioners disparaging Plaintiff's professional candidacy and moral character.

197.    The aforementioned statements are false.

198.    The aforementioned statements were unlawfully retaliatory.

199.    The aforementioned statements are defamatory per se because they damage Plaintiff in her trade or occupation.

200.    Defendant's false statements have permanently damaged Plaintiff's name and professional reputation and Plaintiff is entitled to recover compensatory and punitive damages therefor.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Katherine M. Whipple respectfully requests judgment:

a.    Adjudging and declaring that Defendants violated Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the common law of the State of New York in the manner described above;

b.    Awarding Plaintiff back pay, interest, benefits, and other emoluments of employment;

     c.     Awarding Plaintiff front pay and benefits;

     d.     Awarding Plaintiff compensatory damages in an amount to be determined by a jury;

     e.     Awarding Plaintiff punitive damages in an amount to be determined by a jury;

     f.     Awarding Plaintiff reasonable attorney's fees, including litigation expenses and costs; and

     g.     Awarding any other such relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff respectfully demands a jury trial on every issue so triable.

Dated: December 21, 2015

                                   BLITMAN & KING LLP

                                   Jules L. Smith, Esq.
                                   Nolan J. Lafler, Esq.
                                   *Attorneys for Plaintiff Katherine M. Whipple*
                                   Office and Post Office Address
                                   The Powers Building, Suite 500
                                   16 West Main Street
                                   Rochester, New York  14614
                                   Telephone:   (585) 232-5600
                                   Facsimile:    (585) 232-7738
                                   jlsmith@bklawyers.com
                                   njlafler@bklawyers.com