UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DR. KATHERINE M. WHIPPLE,

                                    Plaintiff,

        v.

REED EYE ASSOCIATES, et al.,

                                    Defendants.
_____

                                    DECISION AND ORDER

                                    15-CV-6759L


        Plaintiff Katherine M. Whipple, a former employee of Reed Eye Associates ("Reed

Eye"), brought this action against six defendants.  Two are legal entities:  Reed Eye and Westfall

Surgery Center ("Westfall"), which operates as a joint enterprise with Reed Eye.  Collectively,

they will be referred to here as "Reed Eye/Westfall."   The other four defendants are individuals:

Reed Eye/Westfall owners Dr. Ronald Reed ("Reed") and Dr. Alan Bloom ("Bloom"); former

Westfall employee Dr. Kurt Weissend ("Weissend"); and Westfall Administrative Director Gary

Scott ("Scott").

        In the complaint, plaintiff alleged that during her employment with Reed Eye, the

defendants subjected her to sexual harassment and retaliation in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and the New York Human Rights

Law, N.Y. Exec. Law §§ 290 et seq. ("HRL").  She also brought claims under New York

common law of tortious interference with contract and defamation.

On October 3, 2016, the Court issued a Decision and Order, 213 F.Supp.3d 492, granting in part and denying in part defendants' motion to dismiss some of the claims in the complaint. The Court dismissed with prejudice:  plaintiff's HRL retaliation claims against Weissend and Scott; plaintiff's defamation claim against Bloom; her tortious interference claim against Reed; and all claims against the individual defendants under Title VII.

In addition, on July 11, 2019, the Court approved and filed a joint stipulation of the parties, by which plaintiff's tortious interference claim was dismissed as to defendant Bloom, and her defamation claim was dismissed as to Reed.  (Dkt. #49.)

All the defendants have now moved for summary judgment dismissing the remaining claims of the complaint.  They have done so in two motions:  one by Weissend, who is represented by separate counsel (Dkt. #45), and one by the other defendants (Dkt. #48).  Plaintiff has filed a response (Dkt. #53) opposing both motions.

## BACKGROUND

Reed Eye is a full-service eye care and ophthalmology services group with six offices in Monroe, Genesee and Wayne counties in New York.  Westfall is a surgery center in Brighton, New York, offering various outpatient surgical procedures and related services.[1]

Doctors Reed and Bloom are licensed ophthalmologists who own equal shares of Reed Eye, and have, respectively, 76% and 5% ownership interests in Westfall.  Although Reed Eye and Westfall have some common ownership interests, they are separate and distinct corporate

---

[1] All locations referenced in this Decision and Order are in New York.

entities.  Reed Eye hired plaintiff as an oculofacial plastic surgeon on September 1, 2013.  She

was not an employee of Westfall, but she performed surgery at Westfall on a regular basis,

usually on Friday, and on some Tuesdays.  Defendant Weissend had nothing to do with plaintiff's

hiring, nor did he supervise her.

When plaintiff began her employment, defendant Weissend was employed by Westfall as

medical director and chief of anesthesiology.  As such, he was responsible for setting schedules

for anesthesiologists and overseeing medical compliance and licensing issues.

During the course of her employment, plaintiff necessarily came into contact with

Weissend, due to both his status as a staff anesthesiologist, and his role in setting

anesthesiologists' schedules for working in the operating room ("OR") with different surgeons,

including Whipple.

At some point, plaintiff (who was single) and Weissend (who was married) began seeing

each other on occasion outside of the workplace.  Although they agree about some of the

specifics of those meetings, such as when and where they occurred, the parties' versions of what

led to and happened at those rendezvous are in some respects disputed.

In the complaint, plaintiff sets out a straightforward, simple account in which she met

Weissend mostly about work-related matters, and Weissend made romantic or sexual advances

toward her, which she consistently rejected.

The parties' deposition testimony has both amplified that basic outline, and revealed stark

differences between their accounts of the relevant events.  The significance of those disputes will

be addressed below.  The Court will provide here only a summary of what transpired, according

to the two sides.  Unless otherwise stated, the facts recited below are not in dispute.

On May 12, 2014, plaintiff and Weissend had dinner together at a restaurant and bar in Pittsford.  They were there for about two hours.  Around the end of that meeting, Weissend attempted to kiss plaintiff.  She alleges that she rejected that attempt and told him not to do it again.

The next day, in response to a text message from plaintiff, Weissend wrote, "I also had a great time last night."  That evening, they had dinner again, at another restaurant and bar in Pittsford, a Rochester, NY suburb.  Afterwards, plaintiff called Weissend and they spoke for about 75 minutes.

Plaintiff had dinner with Weissend a few days later on May 16, at yet another restaurant and bar in Pittsford.  On Saturday, May 17, Weissend met plaintiff at her home.  From there, they went for a walk along the Erie Canal in Fairport.  Plaintiff alleges that at some point, Weissend again attempted to kiss her, and she refused.[2]

During this period of less than a week, plaintiff and Weissend sent each other several text messages, they had dined together alone three times and visited plaintiff's apartment.  In addition to the text mentioned above, Weissend texted plaintiff on May 15 that he was "daydreaming" about her, and on May 16 that texting him would be "okay for next couple hours since I will be mowing lawn and phone will be on my belt."

Plaintiff was sending Weissend encouraging texts as well.  On May 15, she texted him, "I'm thinking I would like to c u more."  In response to his message about mowing his lawn, she

---

[2] Weissend alleges that they kissed "multiple times" on this occasion, both in plaintiff's home and on the canal path.  Weissend Depo. Tr. (Dkt. #54-3) at 17.  According to Weissend, plaintiff was a quite-willing participant.

texted, "I bet you look so gorgeous mowing the lawn."  She also sent him her home address and

wrote, "see you soon but not soon enough."

At some point, plaintiff began keeping a journal, which is part of the record (Dkt.

#48-11).  The entries all relate to her interactions with Weissend.[3]

The entry for May 20 states, "Kurt tells me his wife found out.  Daughter looked at phone

records."  (Dkt. #48-11 at 5.)  The next day, Weissend's daughter confronted plaintiff in the Reed

Eye parking lot and accused plaintiff of having a romantic and sexual relationship with

Weissend, which plaintiff denied.

Ten days later, plaintiff met Weissend at a restaurant and bar in Rochester "to discuss

wife & situation."  As plaintiff described it in her journal, Weissend said that his "wife [was]

crazy and won't stop."

More communications followed, some of which will be set forth here, but it is clear that

from that point forward, the social relationship between plaintiff and Weissend began, and

continued, to change, although plaintiff continued to send revealing texts to Weissend.

Apparently much of the reason for that was that Weissend's wife was upset about what

she believed–rightly or wrongly–to be an illicit affair between plaintiff and Weissend.

Plaintiff alleges that on June 3, Weissend attempted to kiss her at Westfall, and she once

again rebuffed his attempt.  That is the last time that Weissend allegedly attempted to kiss

plaintiff, or make any attempts at physical intimacy with her.  On June 13, Weissend removed

---

[3] At her deposition, plaintiff testified that she started the journal on May 13, but the first handwritten entry
is dated May 12, 2014.  Whipple Tr. (Dkt. #48-5) at 37; Dkt. #48-11 at 5.

himself from plaintiff's OR rotation, in an apparent effort to maintain physical separation from her.  It appears that they never worked together again.

In a June 18 text, plaintiff sent Weissend a picture of the Cowardly Lion from *The Wizard of Oz*, with a comment that it was his "portrait."  When he did not respond, she sent him another text stating, in part, "Come on, doll, don't get upset.  I was trying to make you smile.  Okay.  Here's a pic of what I would like to do with you very gently.  Think of that during your drive.  I will miss you.  This message with self-destruct after reading."  Attached to that text was a photograph of a kitten licking another kitten.

Within a matter of days, that sentiment had dramatically changed.  In a text message sent around that time, plaintiff told Weissend that his wife had been "texting me, threatening me, every day!!! YOU NEED TO SET THIS FUCKING BITCH RIGHT."  (Dkt. #48-20 at 56.)  She asked Weissend to call or text her back and added, "If u r dumb enough to think I can handle this without u talking to me bc ur wife has forbidden u then fuck u."  She told Weissend that if he did not respond, she would call Dr. Reed "to tell him EVERYTHING.  Afterall the medical director hitting on the new young physician is very unbecoming.  I'm not gonna have it crazy wife and it coward ness [sic] harm my life or career in any way."  *Id.* at 57.[4]

Weissend responded a short time later, stating that he "had no idea [his wife] was communicating with you," and that he wanted to talk to plaintiff.  (Dkt. #48-20 at 58.)  Plaintiff

---

[4] The exact date when this text was sent is not of great importance here, but plaintiff agrees with defendants that it was sent "around the same timeframe" as her other interactions with Weissend in June 2014.  *See* Dkt. #48-2 ¶ 95, #54-19 ¶ 95.  The only indication of when the text was sent is a notation that it was sent on a Monday at 4:00 a.m.  (Dkt. #48-20 at 56.)  June 23, 2014 fell on a Monday, so it could have been sent then.  Plaintiff testified that when she sent it, she was in New York City with a friend.  Whipple Tr. at 189.

replied that Weissend's wife "says these terrible awful things that aren't true.  From day one I said I wanted nothing to do with your marriage."  *Id.* at 59.

On June 24, plaintiff texted Weissend that she would "like to meet up" with him, and offered to meet either at her house or to "meet out."  *Id.* at 63.  She said she wanted to show Weissend "the ways in which [his] wife ha[d] been harassing [her] and get explanation for some of the things she said bc I don't even know what she is talking about."  *Id.*

Later that day, plaintiff met Weissend at a bar and grill, once again, in Pittsford.  Shortly after Weissend got them drinks at the bar and they sat down at a table, Weissend's wife walked in.

Things did not go well.  After a brief verbal exchange, plaintiff got up to leave, whereupon Weissend's wife allegedly grabbed her arm.  Plaintiff ended up calling 911 and filing a police report.  Whipple Tr. at 194-95.  An order of protection was eventually issued against Mrs. Weissend.

On July 1, plaintiff received one or more texts from Weissend's wife, which plaintiff reported to the police.  Mrs. Weissend was eventually convicted of harassment in the second degree for violating the no-contact order.  *See* Whipple Aff. (Dkt. #54-8) ¶ 41 and Exs. F, G.

At the time plaintiff received those texts, she was at a bar/restaurant with Heather Bartlett, Westfall's clinical director.  Both then and a few days later, plaintiff told Bartlett that Mrs. Weissend falsely believed that her husband was having an extramarital affair with plaintiff.  Whipple Aff. ¶¶ 43-45.  Bartlett states in an affidavit (Dkt. #48-21) that at that point, she did not see this as a workplace issue, since plaintiff's problem seemed to be entirely with Weissend's wife, not with him, so she did not take any action in response.  *Id.* ¶ 17.

Bartlett goes on to say that on another occasion in late July or early August, she met Whipple for drinks at a local pub. Whipple mentioned that she believed that Weissend and his wife were at a particular restaurant, and suggested going there to "see if he was there." When they arrived, plaintiff "ducked down in the passenger's seat ... and asked [Bartlett] to drive around to search for Dr. Weissend's car ... ." Bartlett Aff. ¶ 19. It is notable that Bartlett described plaintiff as having an "obsession" with Weissend. *Id.* ¶ 20.

On or about August 4, 2014, plaintiff learned that Weissend's wife had stopped at Westfall and been asking questions about her. Plaintiff reported this to Scott, the Administrative Director. He responded by telling plaintiff that Westfall would immediately install a new security system, limiting access by non-employees, which was done.

On October 24, 2014, Weissend placed a letter in plaintiff's handbag at Westfall, in which he apologized for "dropp[ing] everything between" them, adding,"I regret any pain I have caused you" (Weissend Ex. K). Weissend stated that he continued to be attracted to plaintiff, whom he found "beautiful" and "sexy," but he made further statements to the effect that it would be best for both of them to keep their relationship strictly professional. Plaintiff reported this note to Scott on October 26.

Plaintiff also spoke to Reed, who asked to meet with her on November 1, 2014 at his home. At the meeting, Reed was sympathetic to plaintiff, and told her that based on her account, he would fire Weissend.

Before doing so, however, Reed wanted to speak with Weissend, and they met on November 3. Apparently Weissend told him, among other things, that his relationship with

plaintiff had been entirely consensual.  After hearing Weissend's side of the story, Reed did not terminate Weissend.

Reed then held a meeting with plaintiff and Weissend on November 13.  At the meeting, plaintiff asked that Weissend–who had removed himself from plaintiff's OR anesthesiologist rotation in June–be returned to her regular rotation; in other words, that he and she would begin working together again.  Since plaintiff claimed, in effect, to be a victim of sexual harassment, this request must have seemed curious at best.  Plaintiff testified that she did so because (in sum and substance) she wanted to avoid further office gossip and return things to normal.

It seems this was not the first time the subject of Weissend's return to plaintiff's OR rotation had come up, although it may have been the first time that Reed heard about it.  In an email dated October 31, 2014, Weissend told plaintiff that he had "discussed this issue at length with Gary Scott," but thought that it would be "in each of our own best interests to remain in separate operating rooms for the time being."  Weissend Aff. Ex. L (Dkt. #48-20).

In any event, Weissend did not return to the OR rotation.  Instead, he resigned his position as medical director, effective December 8, 2014, and he never again worked with plaintiff in the OR.

All of these events overlapped with the expiration of plaintiff's first-year contract in September 2014, and her negotiations with Reed and Bloom concerning a new contract or other arrangement.

During her first year, plaintiff's compensation equaled about 42% of the revenue received by Reed Eye for her services.  Plaintiff asked for a raise, seeking as much as 55% of her revenues, which Reed and Bloom would not agree to.  Though the details of the negotiations are

at some points in dispute, it is clear that they did not go smoothly.  Reed states that he was

"flabbergasted" by her demands, which he considered "excessive and unacceptable."  Reed Aff.

(Dkt. #48-12) ¶¶ 47, 48.  While the negotiations were ongoing, plaintiff continued to work under

the terms of her original contract.

Sometime during the negotiations, Reed and Bloom discussed with plaintiff the

possibility of her becoming a new partner.  Discussions continued to falter, over both the issues

of plaintiff's compensation and whether she would have immediate voting rights if she were to

join the partnership.

As stated, all this was happening during a period of tension in the Fall of 2014 concerning

the relationship between plaintiff and Weissend.  Apparently that relationship was not exactly a

secret at Westfall by that point, because in a memorandum to "All WSC Partners" dated

December 22, 2014, Bloom "voice[d] his opinion regarding the recent issues" between Weissend

and plaintiff, "as they pertain to patient care."  Bloom recommended "separat[ing] them

indefinitely" as a "practical and prudent" solution, which would cause neither of them to "suffer

any hardship," and which would allow the quality of patient care to "remain at its usual high and

unimpeachable standard."  Bloom Aff. Ex. B (Dkt. #48-15 at 5).  That memorandum seems to

have been prompted by Weissend's decision to remove himself from work assignments in

plaintiff's OR, and plaintiff's contrary request that he be restored to those assignments.

On December 29, 2014, plaintiff met with Gary Scott to discuss the ongoing situation

involving her and Weissend.  Scott told her that based on the recommendation of outside

counsel, she and Weissend would not be working in the same OR for the time being.  Plaintiff,

-10-

unhappy with that decision, responded by saying that she would "take [her] cases elsewhere and just not be at Westfall anymore."  Whipple Tr. at 258.  This was a startling new development.

The next day, plaintiff sent an email to Reed, stating in part, "Just like Westfall needs to do what is best for Westfall, I need to do what is best for me.  And that is to operate elsewhere."  Reed. Aff. Ex. B (Dkt. #48-13 at 6).  This was a crucial, defining rejection of defendants' business and a significant basis for her termination.[5]

Within days, Reed and Bloom agreed to terminate plaintiff's employment.  They arranged a meeting with her on January 6, 2015, at which they informed plaintiff that she was terminated as of that date.  Defendants contend that their decision was prompted not just by plaintiff's stated decision to pull her cases from Westfall, but by information they had received from others, to the effect that plaintiff had made disparaging statements about them, and that she had divulged details of confidential partnership negotiations.  There is no evidence that they discussed this decision with Weissend or that had any input.

Plaintiff filed the complaint in this action on December 21, 2015.  Pursuant to this Court's Decision and Order of October 3, 2016, and the subsequent stipulation of the parties, the following claims remain:  (1) sex discrimination against Reed Eye/Westfall under Title VII; (2) unlawful retaliation against Reed Eye/Westfall under Title VII; (3) sex discrimination against all the defendants under the HRL; (4) unlawful retaliation against Reed Eye/Westfall, Reed and Bloom under the HRL; (5) tortious interference with business relations, as to Reed/Westfall; and (6) defamation as to Reed/Westfall.

---

[5] At her deposition, plaintiff testified that she "intended to continue to work at Reed Eye as an employee" but book her surgery cases at a different facility.  Whipple Tr. at 258-59.

**DISCUSSION**

**I. Sex Discrimination Claims**

**A. Discrimination**

As stated, plaintiff has asserted a sex discrimination claim under Title VII, and another under the HRL.  The standards applicable to claims under those two statutes are the same.  *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 n.4 (2d Cir. 2014); *Pucino v. Verizon Wireless Comms., Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010).[6]

Before turning to the merits of plaintiff's sex discrimination claims, however, the Court must first determine the precise nature of the claims.  They are somewhat imprecise.  While the complaint describes these as claims for sex discrimination, plaintiff's allegations also have aspects of a hostile work environment claim.  In addition, the parties' motion papers seem to treat her claims as hostile environment claims, at least in part.

Although in a general sense, hostile work environment claims can be considered a subset of discrimination claims, in the sense that the hostility in question must in some way relate to the plaintiff's membership in a protected class, in legal parlance "discrimination" and "hostile environment" are often used to refer to distinct types of claims.  As explained in a case from the Eastern District of New York, "[a] hostile work environment claim is conceptually distinct from other Title VII claims.  The former analyses a workplace environment as a whole to discover whether it is abusive, whereas the latter scrutinizes discrete harms such as hiring or discharge."

---

[6] The one significant difference between the statutes is that the HRL, unlike Title VII, allows for individual liability under some circumstances.  That aspect of plaintiff's claims is addressed below.

*Pape v. Dircksen & Talleyrand Inc.*, No. 16-CV-5377, 2019 WL 1435882, at *9 (E.D.N.Y. Feb. 1, 2019), *report and recommendation adopted*, 2019 WL 1441125 (E.D.N.Y. Mar. 31, 2019) (internal quotes, citations and alteration omitted).  Accordingly, for purposes of this Decision and Order, "sex discrimination" and "hostile work environment" will be understood to refer to related, sometimes overlapping, but nonetheless distinct types of claims.  And since plaintiff has at least facially asserted claims of both sex discrimination and hostile work environment, the Court will address both.

The Court analyzes sex discrimination claims using the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See, e.g.*, *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74-75 (2d Cir. 2016).  At the initial step, plaintiff must make out a *prima facie* case of sex discrimination by demonstrating that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."  *Liebowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009). "The burden of establishing a *prima facie* case is not onerous, and has been frequently described as minimal."  *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) (internal quotation marks omitted).  *See also Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75-76 (2d Cir. 2016) (moving directly to third *McDonnell Douglas* step of discrimination claim analysis in part because plaintiff's "burden at the prima facie stage is minimal").

If the plaintiff successfully establishes a *prima facie* case, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action."  *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011) (internal quotation marks

-13-

omitted).  At that second step, the defendant employer "need not persuade the court that it was

actually motivated by the proffered reason." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168

(2d Cir. 2014) (internal quotation marks omitted).

If the employer carries that burden, "the plaintiff's admissible evidence must show

circumstances that would be sufficient to permit a rational finder of fact to infer that the

defendant's employment decision was more likely than not based in whole or in part on

discrimination." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).  At this step, the

plaintiff has the burden to show "that the motive to discriminate was one of the employer's

motives, even if the employer also had other, lawful motives that were causative in the

employer's decision." *Univ. of Texas Southw'n Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013).

As stated, HRL claims are subject to the same analysis.  *See Ruiz v. County of Rockland*, 609

F.3d 486 (2d Cir. 2010).

In the case at bar, the first two parts of the *prima facie* case are beyond dispute.  Plaintiff

is a woman, claiming discrimination on account of her sex, and she was indisputably qualified

for her position.  But despite the light burden imposed on plaintiff at the *prima facie* stage, her

claim falters at the third and fourth steps.

There is no question that plaintiff was subjected to an adverse job action; she was

terminated.  But the third and fourth steps are linked.  For purposes of a discrimination claim, the

adverse action must have occurred because of discriminatory animus.

There is no evidence in the record from which a factfinder could reasonably conclude that

plaintiff was terminated on account of her sex.  For one thing, the two individuals who decided to

terminate her employment, Reed and Bloom, were the same people who decided to hire her in

-14-

2013, and to offer her a partnership (albeit under terms she found unacceptable) not long before her termination.  The Second Circuit has stated that the fact that a plaintiff was hired and fired by the same person or persons within a short time frame is a "highly relevant factor" that weighs in favor of granting summary judgment for the defendant.  *Downey v. Adloox, Inc.*, 789 Fed.Appx. 903, 907 (2d Cir. 2019).

As will be explained in more detail below, the evidence makes clear that plaintiff was terminated for reasons other than her sex.  Her gender had nothing to do with it.  The Court need not credit the reasons proffered by defendants (such as plaintiff's insubordination and decision to take her surgery cases elsewhere) to conclude that.  Plaintiff's own allegations do not indicate that she was terminated on account of her sex; she alleges that she was let go not because she was a woman, but because of her complaints about Weissend.  Although the problems between plaintiff and Weissend were tangentially related to plaintiff's gender, these factual allegations more properly fit within plaintiff's claims of unlawful retaliation, discussed below.

Apart from her termination, plaintiff has not alleged any adverse job actions attributable to sex discrimination.  At oral argument, plaintiff's counsel was hard-pressed to identify specific acts of discrimination taken against plaintiff.  He could come up with little beyond an assertion that the removal of Weissend from plaintiff's anesthesiologist rotation "stigmatized" plaintiff in the eyes of the staff at Westfall.

That falls far short of what is needed even to make out a *prima facie* case of sex discrimination.  To meet the "adverse action" element of a discrimination claim under Title VII, the plaintiff must show that she was subjected to "a materially adverse change in the terms and conditions of employment," which "must be more disruptive than a mere inconvenience or an

-15-

alteration of job responsibilities." *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) (citations omitted).  Examples include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotations and citations omitted).

Apart from her termination, which was addressed above, plaintiff has identified no such actions.  Just because some members of the staff knew that she and Weissend were not supposed to work together, that did not materially affect the terms and conditions of her employment in any way.  Plaintiff has therefore failed to make out a claim of sex discrimination.  *See Belton v. Borg & Ide Imaging, P.C.*, __ F.Supp.3d __, 2021 WL 98392, at *5 (W.D.N.Y. 2021) (finding no adverse action where plaintiff's "employment terms and conditions have remained exactly the same despite [the employer's] conduct"); *Kennedy v. Bernhardt*, No. 18-CV-647, 2020 WL 7399050, at *7-*8 (W.D.N.Y. Dec. 16, 2020) ("while the Defendant's actions may have resulted in an unpleasant work environment, Kennedy has not connected these actions to a material loss in pay, promotion, opportunity, prestige, reputation or workplace accomplishments, or some similar actions") (internal quotes omitted); *Vuono v. Consolidated Edison of N.Y., Inc.*, No. 18-CV-1635, 2019 2433654, at *4 (S.D.N.Y. June 11, 2019) ("the alleged stigma and embarrassment of Plaintiffs' continued participation in the On Call program is insufficient as a matter of law to constitute an adverse employment action").  *See also Whipple*, 213 F.Supp.3d at 496 (dismissing plaintiff's HRL retaliation claim against Weissend on the ground that plaintiff

had not alleged "that Weissend's refusal to work with her had the effect, by itself, of altering the terms and conditions of her employment").

### B. Hostile Work Environment

As noted, the thrust of what are denominated in the complaint as sex discrimination claims is that plaintiff was subjected to a hostile work environment. In that respect, the claims fare no better, however.

To establish a hostile work environment claim, a plaintiff must show that the conduct "(1) is objectively severe or pervasive in that it creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's protected characteristic." *Figueroa v. Johnson*, 648 Fed.Appx. 130, 134 (2d Cir. 2016). "A hostile work environment claim requires a plaintiff to show that his or her workplace was 'so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his or] her employment were thereby altered.'" *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 101 (2d Cir. 2020) (quoting *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013)).

Plaintiff thus faces a high bar to establish "severe" or "pervasive" conduct. She fails to carry that burden here.

"The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that she personally considered the environment hostile, and that the environment rose to some objective level of hostility." *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001). Plaintiff must allege, and ultimately prove, "not only ... that she found the environment offensive, but that a reasonable

person also would have found the environment to be hostile or abusive," *Bentivegna v. People's United Bank*, No. 14-cv-599, 2017 WL 3394601, at *13 (E.D.N.Y. Aug. 7, 2017) (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 21-22 (1993)).

To make this showing, the plaintiff "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Id.* at 374 (quotations omitted). In other words, there is a sliding scale between the severity and the frequency or continuity of the harassing behavior. *See Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) ("[a]s a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness") (citations and internal quotation marks omitted); *Dash v. Bd. of Educ. of City Sch. Dist. of New York*, 238 F.Supp.3d 375, 386 (E.D.N.Y. 2017) ("There is neither a threshold magic number of harassing incidents that gives rise, without more, to liability [for a hostile work environment] as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim") (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000)).

Under Title VII, plaintiff also needs to show "that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano*, 294 F.3d at 373; *Byrne v. Telesector Resources Group, Inc.*, No. 04CV76, 2007 WL 962929, at *18 (W.D.N.Y. Mar. 29, 2007), *aff'd*, 339 Fed.Appx. 13 (2d Cir. 2009); *accord Rasmy v. Marriott Int'l Inc.*, 952 F.3d 379, 387 (2d Cir. 2020). "Two such bases exist: strict vicarious liability if an employer's supervisor has created the hostile environment; and negligence if a co-worker who is not a supervisor has created the

hostile environment, and the employer, upon becoming aware of the misconduct, fails to remedy it." *Bentley v. Autozoners, LLC*, 935 F.3d 76, 91 (2d Cir. 2019).

Applying these standards here, the Court must first determine which incidents or acts are relevant to plaintiff's claim. Many of the acts of alleged harassment occurred outside the workplace, and not all were committed by Weissend or any other defendant. In particular, Whipple alleges that she was harassed by Weissend's wife, and that she had at least one confrontation with his daughter. *See* Whipple Tr. at 101, 141.

"Conduct wholly outside of the workplace has been held insufficient to form the basis of a hostile work environment claim." *Vereen v. City of New Haven Public Works Dep't*, No. 17-cv-1509, 2018 WL 950117, at *2 (D.Conn. Feb. 20, 2018). *See, e.g.*, *Feliciano v. Alpha Sector, Inc.*, No. 00 CIV. 9309, 2002 WL 1492139, at *8 (S.D.N.Y. July 12, 2002) (noting allegations "including the alleged kiss, the alleged telephone calls to Feliciano's home, and the 'surprise' meeting at the restaurant all occurred outside of the workplace," and finding the employer not liable for "hostile sexual acts resulting from nonwork-related, off-duty interactions between co-employees"); *Devlin v. Teachers' Ins. & Annuity Ass'n of America*, No. 02 CIV. 3228, 2003 WL 1738969, at *2 (S.D.N.Y. Apr. 2, 2003) ("As a general rule, employers are not responsible under Title VII for hostile sexual acts resulting from nonwork-related, off-duty interactions between co-workers, because those actions are not part of the work environment"); *see also Andersen v. Rochester City Sch. Dist.*, 481 Fed.Appx. 628, 630 (2d Cir. 2012) (affirming summary judgment for school district on claim by teacher arising from harassment by student, and concluding that "no reasonable jury could find that [the student's] entirely out-of-school conduct had the effect of permeating Andersen's workplace with discriminatory intimidation,

-19-

ridicule, and insult.  Those courts that have concluded that harassment occurring outside the

workplace can support a hostile work environment claim have insisted on a greater connection

between the harassment and the work environment") (citation omitted).

In the case at bar, plaintiff does rely on some events that occurred at Westfall.  She

alleges that on one occasion, Weissend tried to kiss her at Westfall.  She also contends that the

note that he placed in her bag at Westfall, his self-removal from her anesthesiologist rotation, and

his wife's unannounced visit also contributed to a hostile work environment.

In light of those allegations, the Court may and will consider the incidents that occurred

outside of Westfall, as they form part of the "totality of the circumstances" concerning whether a

hostile work environment claim has been established.  *Falu v. County of Orange*, 814 Fed.Appx.

655, 659 (2d Cir. 2020).  *See Brown v. N.Y.S. DOCS*, 583 F.Supp.2d 404, 418 (W.D.N.Y. 2008)

(incidents that occurred outside of plaintiff's workplace "provide context for the incidents that

did occur at work, and they tend to show the motivation for the harassing behavior of plaintiff's

coworkers").  But they cannot, in themselves, give rise to such a claim; what matters in the end is

plaintiff's *work* environment.

With that in mind, and drawing all reasonable inferences in plaintiff's favor, I conclude

that defendants are entitled to summary judgment on plaintiff's hostile work environment claim.

If anything, an objective look at the entire record pertaining to all these incidents hurts more than

helps plaintiff.

To the extent that plaintiff's claim is based on Weissend's advances toward her, the Court

cannot ignore the fact that at least initially, she seemed very receptive to his overtures.  Plaintiff

was a willing participant in the several meetings and revealing texts.  She was not forced to do any of those things.  At times, she was more than a willing participant, she was an instigator.

Even crediting plaintiff's allegation that she rejected Weissend's attempt to kiss her on May 12, 2014, the fact remains that they continued to meet for dinner, drinks, and walks along the canal, and to send each other text messages that were clearly affectionate, if not romantic, and had nothing to do with work.  Plaintiff texted Weissend that she would like to see him more, that seeing him soon would not be soon enough, and that she imagined he would look "gorgeous" mowing his lawn.  That hardly bespeaks someone who considered herself to have been the recipient of unwanted attention, or who wanted to keep her relationship with Weissend on a strictly professional level.

The undisputed facts show that the relationship between plaintiff and Weissend took a decidedly sharp turn for the worse after–to use plaintiff's words–his wife "found out."  That occurred around May 20, 2014.

From that point forward, plaintiff has identified only a handful of acts by Weissend that she alleges contributed to a hostile work environment, but I find as a matter of law that whether viewed singly or collectively, they do not give rise to a genuine issue of material fact.

Plaintiff alleges that Weissend attempted to kiss her at work on June 3, and that she turned away, but with that exception, Weissend made no further physical advances.

Despite that alleged rebuff, it is evident that *plaintiff* continued to pursue a non-work-related relationship with Weissend, but *he* did not reciprocate.  For example, it is undisputed that in or around June 2014, plaintiff gave Weissend a card in which she had written four song titles.  The songs and their lyrics (in parentheses) include:  "A Sky Full of Stars" by

Coldplay ("I'm gonna give you my heart," "I want to die in your arms," "You're such a heavenly view"); "Am I Wrong?" by Nico & Vinz ("Am I wrong for thinking that we could be something for real?"); and "Friday I'm in Love" by the Cure ("It's Friday I'm in love"). This is hardly consistent with a person trying to avoid the romantic overtures of a colleague.

On July 23, 2014, plaintiff was the self-admitted "ringleader" of a group of employees at Westfall who festooned Weissend's car with decorations related to singer Lyle Lovett, because Weissend was known to be a fan of Lovett's music. Plaintiff testified that she did so because she "didn't want the staff to know that there was any animosity" between them, even though she "despised him at that time." Whipple Tr. at 214-16.[7]

Weissend, who was unaware while this was happening that his car was being decorated, later texted Whipple saying that "[t]he ringleader/mastermind remains at large." Plaintiff responded by texting a photograph of herself with her palms open, in an apparently facetious "I don't know" gesture. *Id.* at 219-20; Weissend Aff. Ex. J (Dkt. #48-20 at 69). Once again, it was plaintiff who was seeking out contact with Weissend, not the other way around.

It was around that time that Weissend removed himself from plaintiff's surgery rotation, so that they would not be working together in the OR. Viewed against the backdrop of everything else that was happening at that time related to plaintiff's employment and her relationship with Weissend, that cannot reasonably be seen as a hostile act, or as creating or fostering a hostile work environment. If anything, Weissend, unlike plaintiff, seems to have been

---

[7] Whipple's later insistence that she "despised" Weissend while she was busy orchestrating the ornamentation of his car brings to mind Queen Gertude's line in *Hamlet*, "The lady doth protest too much, methinks." William Shakespeare, *Hamlet*, act 3, sc. 2. In fact, the same could be said about many other protestations of plaintiff relative to her relationship with Weissend.

trying to *avoid* further problems.  As explained in the above discussion of plaintiff's claim of "stigma," while she may have felt that this led to office gossip about why she and Weissend never worked together, it could not reasonably be found to have caused plaintiff's workplace to be "so severely permeated with discriminatory intimidation, ridicule, and insult" as to alter the terms and conditions of her employment.  *Desardouin*, 708 F.3d at 105.

Furthermore, at least following Weissend's wife's visit to Westfall in early August, when she allegedly quizzed employees about the relationship between her husband and Whipple, probably no working arrangement was likely to ease tensions completely.  If Weissend had resumed working with plaintiff during her surgeries, their relationship–whether actual or perceived–would almost certainly have been the elephant in the (operating) room.  At any rate, it was entirely reasonable for Weissend and the other defendants to decide that the best solution was to keep Weissend and Whipple physically separate at Westfall, even though plaintiff believed otherwise.  As Bloom put it in his December 22 memo, that approach would cause neither of them to "suffer any hardship," and would avoid the risk of compromising patient care, which quite properly was of the utmost concern.

With respect to the visit by Weissend's wife, I note first that while news of it may understandably have caused plaintiff some distress, the incident itself cannot be attributed to defendants.  Weissend's wife's arrival was apparently unsolicited, unexpected, and most likely unwanted by any of the defendants.

Furthermore, once plaintiff complained about it, her concerns were promptly addressed.  Scott, the administrative director, told plaintiff that Westfall would install a new security system, limiting access by non-employees, and that was done.

-23-

The only other act identified by plaintiff as contributing to the allegedly hostile environment is Weissend's placement of a handwritten note in her bag in October 2014. But under no reasonable interpretation could that note be viewed as "hostile," or contributing to a hostile environment, under the standards applicable to Title VII claims.

In that note, which is attached as Exhibit K to Weissend's affidavit, he states, in sum and substance, that he came to realize how close he and Whipple came to having a full-blown affair, and he apologizes for abruptly dropping everything between them. He admits that he remains attracted to her but opines that they will both be better off without each other. He closes by stating that the "regret[s] any pain" he may have caused her. (Dkt. #48-20 at 71-72.) According to plaintiff's own allegations, Weissend slipped the note into her bag surreptitiously. The note could not objectively be seen as an instance of harassment or hostile behavior; quite the contrary. As an apology, it was not threatening, hostile, or objectively offensive.

Whether viewed individually or collectively, then, the acts and incidents relied upon by plaintiff do not, as a matter of law, meet the test of severity or pervasiveness required for a hostile work environment claim. These events were widely separated in time, many of them occurred outside the workplace, and they were not so egregious as to alter the terms and conditions of her employment.

In addition, a Title VII plaintiff bringing a claim of hostile work environment must also show "that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano*, 294 F.3d 373 (2d Cir. 2002). There is no basis whatsoever for doing so here.

As stated, there are two possible bases for imputing to an employer conduct creating a hostile work environment: "strict vicarious liability if an employer's supervisor has created the

hostile environment; and negligence if a co-worker who is not a supervisor has created the hostile

environment, and the employer, upon becoming aware of the misconduct, fails to remedy it."

*Bentley*, 935 F.3d at 91.  Neither is applicable here.

First, the alleged creator of the hostile environment, Weissend, was not plaintiff's

supervisor.  Up to mid-December 2014, he was medical director at Westfall, but plaintiff was not

an employee of Westfall, and was not hired by Weissend; she was an employee of Reed Eye,

which was, under the terms of her employment contract, the sole entity with control over her

work.  *See* Dkt. #56-2 at 13.

Plaintiff asserts that she "believed that Weissend, in his capacity as Westfall's Medical

Director, was her supervisor; that he had substantial authority over her employment; and that

while he could not independently terminate her employment, he had significant influence with

Drs. Reed and Bloom in that regard."  Pl. Mem. at 29-30.  What plaintiff *believed*, however, is

not the test.

"Alleged harassers are considered supervisors for purposes of a Title VII or NYSHRL

claim if they are 'empowered by the employer to take tangible employment actions against the

victim,' such as hiring or firing."  *Detouche v. JTR Transp. Corp.*, 17 Civ. 7719, 2020 WL

7364116, at *16 (S.D.N.Y. Dec. 14, 2020) (quoting *Lamarr-Arruz v. CVS Pharmacy, Inc.*, 271

F.Supp.3d 646, 659 (S.D.N.Y. 2017)).  The record does not show that Weissend had such power,

either actual or apparent, or that he attempted to use any such power with respect to plaintiff's

employment at Reed Eye.  Plaintiff may have believed otherwise, but there is no evidence to

support such a belief.  *See Bradford v. Ins. Mgmt. Admins. of La., Inc.*, Civ. No. 05-1504, 2007

WL 2480358, at *4 (W.D.La. Aug. 30, 2007) (stating that plaintiff "presents no authority to

support her assertion that her belief [that a certain individual was her supervisor] alone was enough for him to be considered a supervisor under a sexual harassment analysis"); *Feliciano v. Alpha Sector, Inc.*, No. 00-9309, 2002 WL 1492139, at *10 (S.D.N.Y. July 12, 2002) (to be considered a supervisor for purposes of Title VII, alleged harasser must have certain "trappings of authority," like the ability to hire and fire or to set plaintiff's schedule).

Nor has plaintiff presented evidence from which a factfinder could conclude that her employer, Reed Eye, became aware of the alleged misconduct but failed to remedy it. Every time plaintiff complained about Weissend's behavior, remedial action was taken. When Whipple talked to Scott about Weissend's wife's visit, new security systems were put in place. When plaintiff told Reed about the note that Weissend had left in her bag, he met with them both individually and together, and he and Bloom attempted to come up with some accommodation that would avoid more problems going forward.

One thing defendants did *not* do was accede to plaintiff's curious request that she and Weissend be put back on a regular rotation, so that they would sometimes work together in the OR. That Reed and Bloom did not think it wise to put the alleged harasser in close proximity with the alleged victim while she was performing eye surgery is hardly a basis upon which to hold Reed Eye liable under a negligence standard.

Plaintiff herself had found just such a solution agreeable on a prior occasion. In early 2014, plaintiff complained to Weissend about working with a particular anesthesiologist. Whipple Aff. at 68-69. Weissend proposed removing that anesthesiologist from the OR rotation on days when plaintiff was working, and she agreed. *Id.* She "was happy with that" arrangement, so much so that she gave Weissend a thank-you card, and "might have given him a

-26-

hug" as well.  Whipple Tr. at 91.  Although plaintiff's problems with that other anesthesiologist apparently related solely to disagreements she had with him about certain medical procedures, it nonetheless seems entirely reasonable for defendants to have believed that a similar approach would be appropriate with respect to Whipple and Weissend.

At oral argument, plaintiff's attorney seemed to suggest that Reed and Bloom could have fired Weissend, as Reed at one point indicated his intention to do.  That changed after he spoke privately with Weissend, heard his account, and then met with both Weissend and Whipple.

Given the undisputed facts here, it was not unreasonable for Reed to hear Weissend's side of the story before making any final decisions, and after Reed met with them both, the decision to maintain their separation in the workplace was likewise reasonable.  On the basis of the record before me, I find as a matter of law that no rational jury could conclude that plaintiff's employer, Reed Eye, was "negligent in controlling [her] working conditions," as required for employer liability under Title VII.  *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).

All of the above reasons are reason enough to conclude that plaintiff's hostile environment claim should be dismissed.  The Court must also observe, however, that throughout Whipple's and Weissend's time working together, she was far from passive insofar as their relationship was concerned.  Plaintiff's communications directed at Weissend ran the gamut from affectionate, playful and teasing to obscenity-laden, demanding, and threatening.

On the facts of this case, the conclusion is inescapable that until Weissend's wife "found out" whatever it was she found out (or thought she found out) about them, Whipple and Weissend engaged in a consensual relationship that extended beyond the workplace.  The precise nature or parameters of that relationship may be disputed, but there can be no doubt that it

existed and that it was consensual.  Plaintiff willingly participated in the relationship, and at times stoked it.  Bartlett, Westfall's clinical director, after recounting some of plaintiff's actions, characterized plaintiff as having an "obsession" with Weissend.  Bartlett Aff. ¶ 20.  The evidence clearly demonstrates a mutual, consensual relationship.

## II. Retaliation Claims

Retaliation claims under Title VII are analyzed using a burden-shifting framework that is analogous to that applied to disparate-treatment discrimination cases.  *See Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir.2000); *Matthews v. Corning Inc.*, 77 F.Supp.3d 275, 292 (W.D.N.Y. 2014).  "[R]etaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII." *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 609 (2d Cir. 2006).

"A [Title VII] plaintiff alleging retaliation bears a similar burden [to a plaintiff alleging sex discrimination] to establish a *prima facie* case, which requires evidence 'showing that (1) she engaged in protected activity, (2) the employer was aware of this activity, (3) she was subjected to an adverse employment action, and (4) a causal connection exists between the adverse action and her protected activity.'"  *Carter v. Autozoners, LLC*, 807 Fed.Appx. 131, 132 (2d Cir. 2020) (quoting *Bentley v. Autozoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019)).  *Accord McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir. 2001).

If the plaintiff makes out a *prima facie* case, a rebuttable presumption of retaliation arises, and the burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).  If

the employer does so, the presumption of retaliation is rebutted, and the burden shifts back to the

plaintiff to "point to evidence that would be sufficient to permit a rational factfinder to conclude

that the employer's explanation is merely a pretext for impermissible retaliation." *Treglia v.*

*Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002) (quoting *Cifra v. General Elec. Co.*, 252 F.3d

205, 216 (2d Cir. 2001)); *accord Miceli v. Mehr*, 830 Fed.Appx. 63, 64-65 (2d Cir. 2020); *Jute v.*

*Hamilton Sundstrand Corp.*, 420 F.3d 166, 179 (2d Cir. 2005).

"A causal connection [between the protected activity and the adverse action] can be

shown either (1) indirectly, by showing that the protected activity was followed closely by

discriminatory treatment, or through other circumstantial evidence such as disparate treatment of

fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory

animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d

337, 353 (2d Cir. 2019); *Hicks v. Baines*, 593 F.3d 159, 170 (2010); *Gordon v. N.Y.C. Bd. of*

*Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

But it is not enough for the plaintiff simply to show *some* connection.  A "plaintiff

alleging retaliation in violation of Title VII must show that retaliation was a '*but-for*' cause of the

adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."

*Kwan v. Andalex Group LLC*, 737 F.3d 834, 835 (2d Cir. 2013) (citing *Nassar*, 570 U.S. at 360)

(emphasis added).  That is a substantial burden.  The Second Circuit in *Kwan* explained that

"'but-for' causation does not require proof that retaliation was the only cause of the employer's

action, ... only that the adverse action would not have occurred in the absence of the retaliatory

motive."  *Id.* at 846.  The plaintiff can make such a showing "by demonstrating weaknesses,

implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate,

nonretaliatory reasons for its action." *Toombs v. N.Y.C. Housing Auth.*, 830 Fed.Appx. 665, 668

(2d Cir. 2020) (quoting *Kwan*, 737 F.3d at 846).

Defendants do not appear to dispute that plaintiff engaged in protected activity. Though

there may be some dispute about the details, the record shows that at some point plaintiff

complained to some degree about several matters involving Weissend, including alleged sexual

harassment. There also is no dispute that all the defendants eventually became aware of her

complaints. And plaintiff clearly suffered an adverse job action, since her employment was

eventually terminated.[8]

The crux of the dispute concerning plaintiff's retaliation claims lies in the fourth element:

a causal connection between plaintiff's protected activity and the adverse action–termination.

As stated, proof of causation can be shown either directly or indirectly. It is fair to say

that there is no direct evidence of retaliatory intent here. Plaintiff alleges that on November

2014, when plaintiff asked Reed why he wanted to meet with both her and Weissend, he stated,

"This [*i.e.*, the problems between her and Weissend] is all drama," and that he "d[id]n't care

about this shit," but that suggests no more than that he viewed their issues with each other as a

personal matter that should be kept out of the workplace to the extent possible. Reed never

expressed displeasure with the fact that plaintiff had complained about Weissend, and he

attempted to work out a mutually satisfactory solution. To the extent that Reed and Bloom made

any statements to each other, plaintiff, or anyone else concerning plaintiff's future employment at

Reed Eye, the evidence shows that such statements related to contract negotiations, plaintiff's

---

[8] As the Court noted in its prior motion on defendants' motion to dismiss, Weissend's refusal to work with her in the OR did not amount to an adverse employment action sufficient to support a retaliation claim. 213 F.Supp.3d at 496.

compensation, and so on.  There is no direct evidence that they were angry at or displeased with plaintiff because she complained about Weissend.

Indirect evidence of causation can include "temporal proximity" between the protected activity and the adverse job action.  In other words, if the adverse action follows closely on the heels of the protected activity, a factfinder might reasonably infer that the adverse action was motivated by retaliatory animus.  *See*, *e.g.*, *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 108 (2d Cir. 2019).

But the protected act and the retaliation typically must "occur in quick succession" to give rise to the inference, *Sirois v. L.I.R.R. Co.*, 797 Fed.Appx. 56, 60 (2d Cir. 2020), and even where the inference is supported, it will not be enough, by itself, to show that the employer's proffered reasons for the adverse action are pretextual.  *See Philpott v. SUNY*, 805 F.3d 32, 34 (2d Cir. 2020) ("Temporal proximity between Philpott's complaints of discrimination and his termination is insufficient, standing alone, to carry his burden to show pretext"); *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy [plaintiff]'s burden to bring forward some evidence of pretext").

Plaintiff invokes the temporal-proximity inference, relying principally on her complaints to, and conversations with, Reed and Bloom in November and December 2014.  Defendants do not deny that those complaints and conversations took place, nor do they deny that those events occurred relatively close in time to plaintiff's termination on January 6, 2015.  Instead, defendants argue that in the context of this case, such temporal proximity is not enough to create

a genuine issue of fact about whether defendants' stated reasons for terminating plaintiff's employment are pretextual.[9]  Defendants relied on many other factors in terminating plaintiff.

The question, then, is simply whether all the evidence, seen in the light most favorable to plaintiff, supports a finding of pretext.  I find as a matter of law that it clearly does not.

First, there is a long list of non-discriminatory, non-retaliatory reasons that amply justified defendants' decision to terminate plaintiff's employment.  They all speak to disloyalty and are based on plaintiff's acts having nothing to do with any protected activity on her part.

Reed and Bloom state that they had been informed that plaintiff had made disparaging comments about them and that she had disclosed confidential information concerning her contract negotiations.  Although plaintiff denies doing those things, Westfall employees have testified that she did and–more to the point–that Reed and Bloom were told that she had done so.  Heather Bartlett, Westfall's clinical director, states that Whipple informed her about some of Whipple's demands (such as immediate partnership) and that Whipple said that Reed and Bloom

---

[9]  In their initial motion papers, defendants argued that the five-month interval between plaintiff's August 5, 2014 complaint to Scott and her January 6, 2015 termination eviscerated any inference of causation between the two. (Dkt. #48-1 at 24.)

It is not clear if defendants continue to press this argument–it is barely mentioned in their reply brief–but it merits little discussion.  Plaintiff's August complaint and her ensuing meeting with Scott appear to have been prompted by, and focused on, Weissend's wife's recent visit to Westfall, not Weissend's alleged sexual harassment of plaintiff.  See Scott Aff. (Dkt. #48-16) ¶ 10 (stating that at his August 5 meeting with plaintiff, she "never suggested that Dr. Weissend was somehow harassing her or otherwise making her uncomfortable in any way").  Although plaintiff cites the unannounced visit by Weissend's wife as part of the backdrop to her hostile work environment claim, she does not appear to contend that she was terminated in retaliation for that complaint.

In addition, there is little if any evidence that Reed or Bloom were made aware of plaintiff's complaints at that time.  If they were unaware of those complaints, then the length of time between the complaints and plaintiff's termination is irrelevant.  See Pena-Barrero v. City of New York, 726 Fed.Appx. 31, 35 (2d Cir. 2018) (no basis for inference of retaliation where decisionmaker was unaware of plaintiff's complaint).

were "cheap bastards."  (Dkt. #48-21 ¶¶ 35, 36.)  Bartlett states that she passed this on to Scott, who relayed it to Reed and Bloom.  *See* Scott Aff. (Dkt. #48-16) ¶ 23.

Likewise, Anne Marie Phelps, the practice manager at Reed Eye, states that Whipple "often disclosed" to her confidential information concerning her partnership negotiations in late 2014, and "repeatedly badmouthed" Reed and Bloom to her and others.  Phelps states that she shared that information with Reed.  (Dkt. #48-22 ¶ 3.)

Again, though plaintiff denies (or at least does not admit) making some or all of these statements, the record indicates that Reed and Bloom were told that she had.  That alone would have given them sufficient reason to terminate her employment.

Plaintiff also admits that in late December 2014, she informed Scott and Reed that she would be pulling her surgery cases from Westfall and taking them elsewhere.  She did so against the advice of multiple Westfall staff members, and despite her awareness that this would make Reed angry, because it would cause Westfall to lose revenue.  Plaintiff began following through with this course of action, without the consent of Reed or Bloom.  All these facts are admitted by plaintiff and documented in the record.  *See* Def. Statement of Facts ("DSOF") (Dkt. #48-2) ¶¶ 191-95; Pl. Counter-Statement of Facts ("PSOF") (Dkt. #54-19) ¶¶ 191-95; Reed Aff. Ex. B (Dkt. #48-13).  Clearly, such an act was disloyal and harmful to defendants' business.  It seems tantamount to *plaintiff* terminating the relationship.

Plaintiff asserts that defendants have provided "shifting rationales" for their decision to terminate her.  That is incorrect.  Defendants have offered *multiple* grounds for their decision, but they have not shifted from one to another or presented a "moving target" defense.  *See Pelcha v. MW Bancorp, Inc.*, 984 F.3d 1199, 1209 (6th Cir. 2021) ("while an employer's shifting

termination rationales are evidence that the proffered rationale may not have been the true motivation for the employer's actions, providing additional, non-discriminatory reasons that do not conflict with the one stated at the time of discharge does not constitute shifting justifications") (internal quotes and citations omitted). *See*, *e.g.*, *Figurowski v. Marbil Investors, LLC*, No. 14-CV-7032, 2018 WL 1582072, at *12 (E.D.N.Y. Mar. 30, 2018) (rejecting plaintiff's "shifting rationales" argument, since defendants "consistently pointed to a number of reasons that contributed to their decision to fire" plaintiff, rather than to several, shifting reasons, and since there was no contradiction among defendants' proffered motives).[10]

It should also be noted that Reed and Bloom, who jointly decided to terminate plaintiff's employment, had only very recently offered her a partnership at Reed Eye.  In fact, they proposed to her the exact same terms under which Bloom had joined the partnership in or around 1990.  DSOF ¶ 162; PSOF ¶ 162.  But under the terms of that proposal, plaintiff would have no voting rights until the end of a buy-in period.  Plaintiff balked at that; she wanted a better deal.

That proposal never came to fruition, nor did the various proposals and counter-proposals to enter into a new employment contract.  It appears that the negotiations got hung up on various matters including plaintiff's voting rights and compensation.  She demanded more than defendants were prepared to offer.  But this had nothing to do with "retaliation."

The salient point is that at least until late December 2014, Reed and Bloom were willing to continue plaintiff's employment, either under the terms of a new employment contract or a

---

[10] The parties agree that at the time of her termination, plaintiff was simply told that her employment was ending, and that she was terminated without cause.  That does not mean that defendants were terminating her for no reason, but only that she was not being terminated "for cause," *i.e.*, because of misconduct or one of the other grounds listed in her employment contract, *see* Dkt. #48-11 at 23, § 18.

partnership agreement.  They were indisputably aware at that time of plaintiff's complaints about Weissend.  It was not until the negotiations broke down over the terms of an agreement, Reed and Bloom heard that plaintiff had been disparaging them to staff members, and she informed them that she was going to perform her surgeries elsewhere that they decided to end her employment.

As mentioned in connection with plaintiff's discrimination claim, the Second Circuit has consistently held that where a plaintiff was hired, promoted, or otherwise treated favorably, and fired by the same person or persons within a short time frame, that fact undercuts an inference of discriminatory motive.  *See Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (concluding that plaintiff being hired and fired by same person within three years was a "highly relevant factor" that weighs in favor of granting summary judgment for defendant in age discrimination case).  This "same actor" inference is based on the quite reasonable assumption that a person who displays a favorable disposition to an individual is unlikely to develop discriminatory animus against the individual soon thereafter.  *See, e.g.*, *Cordell v. Verizon Comm's, Inc.*, 331 Fed.Appx. 56, 58 (2d Cir. 2009) (affirming summary judgment for defendants where defendants "were responsible for both the promotion and termination decisions within a matter of a few weeks") (quoting *Cordell v. Verizon Wireless*, 550 F.Supp.2d 400, 404 (W.D.N.Y. 2008)); *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to hire.  This is especially so when the firing has occurred only a short time after the hiring").

As with any inference, the strength of the inference will depend on the facts of the case. Here, the facts show that plaintiff was hired on September 1, 2013.  Reed became aware of her complaints about Weissend in November 2014, and Bloom in early December 2014.

Yet within that same time frame, Reed and Bloom offered plaintiff a partnership.  Though the terms offered were not satisfactory to plaintiff, who wanted more favorable terms, they were commensurate with what Bloom had agreed to when he joined the partnership.  Defendants proposed a buy-in period over several years, but that hardly seems remarkable given that plaintiff had only joined Reed Eye a little over a year earlier.  It is virtually inconceivable that defendants would have offered her a partnership at that point, had they decided that because of her issues with Weissend, or her complaints, she had to go.

Then there is Bloom's December 22, 2014 memorandum to "All WSC Partners," in which he recommended "separat[ing Whipple and Weissend] indefinitely."  In that memo, Bloom opined that this would minimize any risk of compromising patient care, without causing either Whipple or Weissend (who by that point had resigned as Westfall's medical director) to suffer any hardship.  That hardly evidences an intent to oust plaintiff or an expectation that she would soon be gone.  In itself, it is not conclusive of Bloom's state of mind, but it further rebuts an inference that plaintiff's complaints about Weissend were a motivating factor in Bloom's eventual conclusion–with which Reed concurred–that Whipple should be let go.[11]

---

[11] I also note that on December 29, 2014–just eight days before plaintiff's termination, and one day before she informed Reed that she would be taking her surgery cases elsewhere–she, Reed and Bloom signed a second employment agreement.  (Jones Decl. Ex. B, Dkt. #56-2.)  The contract was backdated to an effective date of September 1, 2014, *i.e.* the expiration date of her first contract, and provided for a "Renewal Term" of twelve months, "unless sooner terminated ... ."  *Id.* at 15.  At her deposition, plaintiff acknowledged that on December 29, she "extend[ed her] employment contract with Reed Associates."  Whipple Tr. at 256.

Remarkably, the parties have said very little about this document.  It appears from their testimony that it

-36-

It also bears repeating that it is not enough for plaintiff to show that her protected activity may have played *some* role in defendants' decision to terminate her.  Plaintiff must establish that unlawful retaliation was a "but-for" cause of the adverse action.  That is a heavier burden than the "substantial or motivating factor" standard applied to discrimination claims.  *Kwan*, 737 F.3d at 835.  *See, e.g., Collmore v. City of New York*, 767 Fed.Appx. 42, 45 (2d Cir. 2019).

Given the undisputed facts showing that defendants had a lengthy list of non-retaliatory reasons to terminate plaintiff's employment, and the lack of evidence that her complaints about Weissend were any factor in their decision, much less a but-for cause, I find as a matter of law that plaintiff has not demonstrated the existence of a genuine issue of fact concerning whether her termination would have occurred in the absence of the alleged retaliatory motive.  Defendants are therefore entitled to summary judgment on this claim.

**III. State Law Claims**

"In general, where [a plaintiff's] federal claims are dismissed before trial, the state claims should be dismissed as well."  *N.Y. Mercantile Exch., Inc. v. Intercont'l Exch., Inc.*, 497 F.3d 109, 119 (2d Cir. 2007).  The Court has some discretion in this area, however.  The statute governing federal courts' supplemental jurisdiction over state law claims, 28 U.S.C. § 1367, "permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants."  *Purgess v. Sharrock*, 33 F.3d 134, 138

---

was something of a stopgap measure, until a final resolution of their contract/partnership discussions.  (According to Reed, it was his receipt the next day of plaintiff's email informing him that she would be pulling her surgery cases from Westfall that convinced him she needed to be let go.  Reed Aff. (Dkt. #48-12) ¶¶ 56-59.)  Neither side relies on this document, however, and there is no claim of breach of contract, so the Court attaches no weight to this document.

(2d Cir. 1994).  *See*, *e.g.*, *Casiano v. Ashley*, __ F.Supp.3d __, 2021 WL 281460, at *6

(W.D.N.Y. Jan. 28, 2021) ("Because plaintiff's federal and state claims are so closely

intertwined, both legally and factually, in my discretion I grant defendants' motion for summary

judgment as to her [state law] claims of assault and battery"); *Hendrix v. Pactiv LLC*,

__ F.Supp.3d __, 2020 WL 5634329, at *8 (W.D.N.Y. Sept. 21, 2020) ("While my dismissal of

plaintiff's claims based on federal law renders it unnecessary for the Court to reach his claims

under state law, in the interests of judicial economy I do so, since the law is abundantly clear that

the state law claims must be dismissed as well").

As stated, all of plaintiff's HRL claims are governed by essentially the same standards,

and arise out of the same facts, as her claims under Title VII.  The Court therefore dismisses

them as well.  There are some distinctions between Title VII and the HRL that must be

addressed, however.

Unlike Title VII, the HRL allows for individual liability in some circumstances.  Pursuant

to the Court's prior decision on defendants' motion to dismiss, 213 F.Supp.3d 492, plaintiff's

HRL discrimination claims were permitted to go forward against Weissend and Scott.  *See id.* at

496.

As amplified by the record in this case, however, there are several fatal defects regarding

these claims.  First, for the reasons stated above, and in light of the fully developed factual

record, I find as a matter of law that plaintiff was not unlawfully discriminated against in the first

place.

Even if there were some basis for finding that plaintiff had been discriminated against,

however, the claims against Weissend and Scott would have to be dismissed.  Under the HRL, an

individual can be held liable either as an "employer," *i.e.* a supervisor who "actually participates in the conduct giving rise to [the] discrimination," or as an aider and abettor, *i.e.*, "a co-worker who actually participates in the conduct giving rise to a discrimination claim ... even though that co-worker lacked the authority to either hire or fire the plaintiff." *Feingold v. New York*, 366 F.3d at 158 (citing *Tomka v. Seiler*, 66 F.3d 1295, 1317 (2d Cir. 1995)).

Neither Weissend nor Scott were plaintiff's supervisors. Both were employed at Westfall, and they did not control the terms and conditions of plaintiff's employment at Reed Eye. Neither participated in Reed's and Bloom's decision to terminate plaintiff's employment.[12]

Plaintiff's other claims under New York law are for tortious interference with business relations, and defamation, both of which are brought against Reed/Westfall. Unlike her HRL claims, these are not factually or legally intertwined with her federal claims, but relate to events that took place when she was seeking employment after her departure from Reed Eye. Accordingly, I decline to exercise jurisdiction over these claims.

## CONCLUSION

The motions for summary judgment by defendants Kurt Weissend (Dkt. #45) and Alan Bloom, Reed Eye Associates, Ronald Reed, Gary Scott and Westfall Surgery Center LLP (Dkt. #48) are granted.

---

[12] The Court's conclusions render it unnecessary for me to address defendants' arguments that plaintiff either failed to plead or abandoned an aiding-and-abetting claim under the HRL.

All of plaintiff's claims are dismissed with prejudice, except for her fifth and sixth causes of action against Reed Eye Associates and Westfall Surgery Center, which are dismissed without prejudice to whatever remedies may be available to plaintiff in state court.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
        March 8, 2021.

-40-